COMMONWEALTH OF KENTUCKY
MASON COUNTY CIRCUIT COURT
19th JUDICIAL CIRCUIT
_____DIVISION
21-CI-_____

BEULAH M. MURPHY                                          PLAINTIFF,

v.

INDUSTRIAL CONTRACTORS SKANSKA INC.
    **SERVE:** Hon. Jacqueline Kalk
              Littler Mendelson P.C.
              1300 IDS Center, 80 South 8th Street
              Minneapolis, MN 55402-2136
              Direct phone: 612-313-7645
              Email: jkalk@littler.com
    **VIA CERTIFIED MAIL,** *Return Receipt Requested*

And

OPERATING ENGINEERS LOCAL 181                      DEFENDANTS.
    **SERVE:** Hon. James Faul
              Hartnett Reyes-Jones, LLC
              4399 Laclede Avenue
              St. Louis, MO 63108
              Phone: 314-531-1054
              Email:jfaul@hrjlaw.com
    **VIA CERTIFIED MAIL,** *Return Receipt Requested*

## COMPLAINT

Plaintiff Beulah M. Murphy ("Ms. Murphy") states the following Complaint against Defendants Skanska USA Building Inc. ("Skanska") and Operating Engineers Local 181 ("IUOE Local 181" or "Union").

## JURISDICTION AND VENUE

1. Ms. Murphy is a resident and domiciliary of the Commonwealth of Kentucky, residing within Frankfort, Franklin County, Kentucky.

Page 1 of 18

2. Skanska's Principal Office is located in Evansville, Indiana.

3. Kentucky has personal jurisdiction over Skanska because, *inter alia*, Ms. Murphy's injury occurred during her employment with Skanska in Maysville, Mason County, Kentucky. These circumstances comport with provisions of Kentucky's long arm statute, specifically KRS 454.210(2)(a)(1) and (2)(a)(3).

4. Venue is proper pursuant to KRS 452.460.

5. District Four (4) of Union is represented by Richard Lewis ("Lewis"), who maintains an office in Lexington, Kentucky.

6. Lewis maintained a Lexington, Kentucky office between May 22, 2019 and May 31, 2019.

7. District Four (4) of Union encompasses Kentucky counties including Mason County, which includes the municipality of Maysville, which is where Ms. Murphy was employed with employer Skanska from May 22, 2019 to May 31, 2019.

8. The amount in controversy is in excess of seventy-five thousand dollars ($75,000), which exceeds the jurisdictional minimum amount of this Court.

## BACKGROUND AND PROCEDURAL HISTORY

9. Ms. Murphy adopts by reference all preceding and subsequent averments.

10. Skanska employs five hundred and one (501) or more employees at all of their locations collectively.

11. Skanska employed Ms. Murphy at its Maysville, Kentucky location from May 22, 2019 to May 31, 2019 ("the 2019 project").

12. Ms. Murphy served Skanska in the position of Crane Operator from May 22, 2019 to May 31, 2019.

13. Ms. Murphy has been a member of Union for sixteen (16) to seventeen (17) years (since approximately 2004).

14. Skanska is an employer in an industry affecting commerce.

15. Union is a labor organization in an industry affecting commerce.

16. Ms. Murphy is sixty-nine (69) years old as of the filing of this Complaint.

17. During orientation for employment with Skanska, Ms. Murphy orally disclosed that she suffered from a vision and hearing impairment.

18. Ms. Murphy's vision impairment developed into a Cataract.

19. As of August 2020, Ms. Murphy could still hardly see out of her left eye.

20. At orientation for the Skanska employment in May of 2019, Skanska or Union personnel reassured Ms. Murphy that she would have a spotter assist her in her workplace duties, which involved heavy construction equipment, so as to mitigate her vision and hearing impairment.

21. Ms. Murphy's assigned workplace duties included operation of a Forklift and a Skid Steer.

22. A Skid Steer is a type of Compact Loader, which is a more lightweight version of a Backhoe.[1]

23. A Skid Steer, like a Backhoe, is used primarily for digging and loading.[2]

24. Armed with Skanska's reassurance, Ms. Murphy marked on a form that she did not suffer from a disability.

25. Contrary to its reassurance during Ms. Murphy's orientation, Skanska never did provide Ms. Murphy with a spotter.

---

[1] https://www.equipmentworld.com/side-by-side-backhoes-vs-compact-loaders/
[2] *Id.*

26. Skanska was aware that Ms. Murphy suffered from a vision and/or hearing limitation.

27. Skanska was aware that Ms. Murphy suffered from some kind of physical limitation.

28. Skanska never did provide Ms. Murphy with a spotter.

29. Ms. Murphy was the only female Skanska employee at the Maysville, Kentucky location during her tenure with Skanska. Any other women on the premises were most likely affiliated with other entities such as East Kentucky Power, which had contracted Skanska for a project.

30. Ms. Murphy endured lewd, sexist comments during her time with Skanska, including, "If you give her a piece, she'll probably be quiet." Ms. Murphy believes that a certain union member and Skanska employee named Jeffrey Smith uttered that particular comment.

31. On May 31, 2019, Ms. Murphy's direct supervisor and Skanska representative Steve Morton ("Morton") terminated her because "they hired too many people."

32. Contrary to Morton's stated rationale, Ms. Murphy was replaced on the Skanska job with up to three (3) able-bodied male employees who were under forty (40) years old, one of whom (Danny Hogsten) specifically replaced Ms. Murphy as operator of the Skid Steer machine. These three (3) individuals were members of the same union as Ms. Murphy.

33. Union members that Skanska hired as employees after Ms. Murphy were male.

34. Union members that Skanska hired as employees for the 2019 project after Ms. Murphy were male.

35. At least one of the Union members that Skanska hired as employees after Ms. Murphy was male.

36. At least one of the Union members that Skanska hired as employees for the 2019 project after Ms. Murphy was male.

37. Most of the Union members that Skanska hired as employees after Ms. Murphy were male.

38. Most of the Union members that Skanska hired as employees for the 2019 project after Ms. Murphy were male.

39. All of the Union members that Skanska hired as employees after Ms. Murphy were male.

40. All of the Union members that Skanska hired as employees for the 2019 project after Ms. Murphy were male.

41. Union members that Skanska hired as employees after Ms. Murphy were all under forty (40) years old.

42. Union members that Skanska hired as employees for the 2019 project after Ms. Murphy were all under forty (40) years old.

43. At least one of the Union members that Skanska hired as employees after Ms. Murphy was under forty (40) years old.

44. At least one of the Union members that Skanska hired as employees for the 2019 project after Ms. Murphy was under forty (40) years old.

45. The Union members that Skanska hired as employees after Ms. Murphy did not suffer from vision or hearing issues.

46. The Union members that Skanska hired as employees for the 2019 project after Ms. Murphy did not suffer from vision or hearing issues.

47. Most of the Union members that Skanska hired as employees for the 2019 project after Ms. Murphy did not suffer from vision or hearing issues.

48. The Union members that Skanska hired as employees after Ms. Murphy did not suffer from vision issues beyond those that could be managed with glasses or contact lenses.

49. During Ms. Murphy's time with Union, members of the Union have been mostly male.

50. Members of the Union have been mostly male.

51. During Ms. Murphy's time with Union, over fifty percent of members of Union have been male.

52. Over fifty percent of members of Union have been male.

53. During Ms. Murphy's time with Union, members of the Union have been mostly under forty (40) years old.

54. Members of the Union have been mostly under forty (40) years old.

55. During Ms. Murphy's time with Union, over fifty percent of members of Union have been under forty (40) years old.

56. Over fifty percent of Union members have been under forty (40) years old.

57. During Ms. Murphy's time with Union, most members of the Union have not had hearing or vision issues.

58. Members of the Union have mostly not had hearing or vision issues.

59. Over fifty percent of members of the Union have not had hearing or vision issues.

60. During Ms. Murphy's time with Union, over fifty percent of members have not had hearing or vision issues.

61. It was not until after Ms. Murphy's termination that Skanska implemented the use of spotters.

62. Spotters became more available after Ms. Murphy's termination.

63. More individuals occupied the role of spotter (or at least did so more frequently) after Ms. Murphy's termination.

64. Ms. Murphy received a right-to-sue letter, dated October 27, 2020, from the Kentucky Commission on Human Rights (KCHR) and the U.S. Equal Employment Opportunity Commission (EEOC)

65. Ms. Murphy's KCHR/EEOC charge discussed discriminatory treatment by both Skanska and Union.

**COUNT ONE: DISABILITY DISCRIMINATION, VIA DISARATE TREATMENT, FAILURE TO ACCOMMODATE, AND FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS, IN VIOLATION OF THE ADA AND KCRA [AGAINST DEFENDANT SKANSKA]**

66. Ms. Murphy adopts by reference all preceding and subsequent averments.

67. Skanska had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in 2018.

68. Skanska had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in 2019.

69. Skanska had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in 2020.

70. Skanska had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in 2021.

71. Skanska had fifteen (15) or more employees in each of twenty (20) or more calendar weeks in 2018.

72. Skanska had fifteen (15) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2019.

73. Skanska had fifteen (15) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2020.

74. Skanska had fifteen (15) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2021.

75. During her employment with Skanska, Ms. Murphy suffered from disabilities including Cataracts and Shingles.

76. During her employment with Skanska, Ms. Murphy suffered from physical and/or mental impairments that included Cataracts and Shingles.

77. During her employment with Skanska, Ms. Murphy suffered from physical and/or mental impairments.

78. Ms. Murphy's disabilities substantially limit(ed) one or more major life activities, including that of sight.

79. Ms. Murphy's physical impairment(s) adversely affect her ability to see.

80. Ms. Murphy's physical impairment(s) also affect her ability to hear.

81. Ms. Murphy's sight is worse than that of the general population.

82. Ms. Murphy's hearing is worse than that of the general population.

83. During her tenure with Skanska, Ms. Murphy suffered from one or more physical impairments.

84. Skanska knew that Ms. Murphy suffered from one or more physical impairments.

85. Skanska knew that Ms. Murphy suffered from Shingles.

86. Skanska knew that Ms. Murphy had a vision impairment.

87. Ms. Murphy's impairment(s) were the kind that lasted or were expected to last more than six (6) months.

88. Skanska perceived that Ms. Murphy suffered from a physical impairment(s).

89. Skanska perceived that Ms. Murphy's physical impairment(s) substantially limited one or more major life activities.

90. Having worked in the construction industry since 1998 or 1999, Ms. Murphy was qualified for her job with Skanska; at the very least, she was qualified with the accommodation of a spotter.

91. Ms. Murphy was able to perform the essential functions of her job with an accommodation.

92. Ms. Murphy was able to perform the essential functions of her job without an accommodation.

93. Ms. Murphy was never given a document containing a position description or other written iteration of essential functions of the job.

94. Skanska believed that Ms. Murphy's impairment(s) limited her ability to perform her work.

95. Skanska believed that Ms. Murphy's impairment(s) at least somewhat affected her ability to perform her work.

96. After mere days on the job, Ms. Murphy was terminated and replaced by multiple people who did not suffer from disabilities.

97. After mere days on the job, Ms. Murphy was terminated and replaced by multiple people who did not suffer from her disabilities.

98. After mere days on the job, Ms. Murphy was terminated and replaced by multiple people who did not suffer from her physical impairment(s).

99. After mere days on the job, Ms. Murphy was terminated and replaced by multiple people who did not suffer from physical impairment(s).

100. Ms. Murphy was terminated due to her physical impairment(s).

101. Ms. Murphy was terminated in part due to her physical impairment(s).

102. Ms. Murphy requested a spotter to assist her in work tasks.

103. Skanska assured Ms. Murphy that she would have a spotter to assist her in her work tasks.

104. Skanska did not provide Ms. Murphy with a spotter to assist her in her work tasks.

105. Skanska provided employees with spotters only after terminating Ms. Murphy.

106. Skanska did not investigate whether or to what extent Ms. Murphy could perform the necessary duties of the job.

107. Skanska did not investigate Ms. Murphy's medical condition(s).

108. Skanska did not investigate the effect(s) of Ms. Murphy's medical condition(s).

109. Skanska terminated Ms. Murphy prior to completing an investigation into how if at all her medical condition(s) affected her ability to perform the job.

110. Prior to terminating Ms. Murphy, Skanska started but did not complete an investigation into how her medical condition(s) affected her ability to perform the job.

111. Skanska did not send Ms. Murphy to a medical evaluation.

112. Skanska did not request any medical records of Ms. Murphy.

113. Skanska did not ask Ms. Murphy what would assist her with performance of the job.

114. Skanska did not take into consideration Ms. Murphy's suggestions as to what would improve her performance of the job.

115. Skanska did not ultimately implement Ms. Murphy's suggestions as to what would improve her performance of the job.

116. Skanska did not modify Ms. Murphy's work environment, requirements, or schedule.

117. Skanska suspected that Ms. Murphy was having trouble performing some of her work tasks.

118. Skanska did not attempt to make it easier for Ms. Murphy to complete her work tasks.

119. Before and during Ms. Murphy's tenure, Skanska knew the requirements of the ADA.

120. Skanska trains its representatives and/or employees on the ADA.

121. Skanska has, at least at some point prior to or during Ms. Murphy's tenure, trained its representatives and/or employees on the ADA.

122. Due to Skanska's violation of the ADA, Ms. Murphy is entitled to compensatory damages, punitive damages, attorney's fees, lost wages, and costs.

123. Due to Skanska's violation of the KCRA, Ms. Murphy is entitled to compensatory damages, attorney's fees, lost wages, and costs.

**COUNT TWO: SEX DISCRIMINATION IN VIOLATION OF THE KCRA**
**[AGAINST DEFENDANT SKANSKA]**

124. Ms. Murphy adopts by reference all preceding and subsequent averments.

125. Skanska had eight (8) or more employees in each of twenty (20) or more calendar weeks in 2018.

126. Skanska had eight (8) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2019.

127. Skanska had eight (8) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2020.

128. Skanska had eight (8) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2021.

129. Ms. Murphy was the only female Operator at the Maysville, Kentucky location during her tenure.

130. Ms. Murphy was the only female Skanska employee at the Maysville, Kentucky location during her tenure.

131. Ms. Murphy was the only female employee with her particular set of duties at the Maysville, Kentucky location during her tenure.

132. Ms. Murphy was terminated.

133. Ms. Murphy was replaced with one or more male employees.

134. Skanska told Ms. Murphy that she was being terminated or laid off because it (Skanska) had hired too many people.

135. Due to Skanska's violation of the KCRA, Ms. Murphy is entitled to compensatory damages, attorney's fees, lost wages, and costs.

**COUNT THREE: AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) AND THE KCRA [AGAINST DEFENDANT SKANSKA]**

136. Ms. Murphy adopts by reference all preceding and subsequent averments.

137. Skanska had eight (8) or more employees in each of twenty (20) or more calendar weeks in 2018.

138. Skanska had eight (8) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2019.

139. Skanska had eight (8) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2020.

140. Skanska had eight (8) or more employees in the state of Kentucky in each of twenty (20) or more calendar weeks in 2021.

141. Skanska had twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding year.

142. Skanska terminated Ms. Murphy on May 31, 2019.

143. Skanska replaced Ms. Murphy with up to three (3) individuals, at least one of whom was under forty (40) years old.

144. Skanska knew that Ms. Murphy was over sixty (60) years old when it terminated her.

145. Due to Skanska's violation of the KCRA, Ms. Murphy is entitled to compensatory damages, attorney's fees, lost wages, and costs.

146. Due to Skanska' violation of the ADEA, Ms. Murphy is entitled to lost wages, liquidated damages, attorney's fees, and costs.

**COUNT THREE: SEX, AGE, AND DISABILITY DISCRIMINATION IN VIOLATION OF THE KCRA [AGAINST DEFENDANT UNION]**

147. Ms. Murphy adopts by reference all preceding and subsequent averments.

148. Union is a labor organization within the meaning of KRS 344.030(4).

149. Union is an employment agency within the meaning of KRS 344.030(3).

150. Union is not a bona fide private membership club.

151. Union is engaged in an industry affecting commerce.

152. Employees participate in Union's activities.

153. Union exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment.

154. Union refers employees to prospective employers.

155. Subject to certain requirements, Union provides members with employee benefits including health insurance benefits, death benefits, and pension benefits. The benefits are in part provided by insurer Anthem BlueCross and BlueShield ("BlueCross").

156. During the period of June 30, 2019 to November 30, 2019, Union did not provide Ms. Murphy with health insurance benefits, death benefits, or pension benefits.

157. Plaintiff was again eligible for coverage by BlueCross from December 1, 2019 to December 31, 2019.

158. Plaintiff was not eligible for BlueCross coverage from January 1, 2020 through at least December 18, 2020.

159. Union is jointly and severally liable with Skanska for violation of the Kentucky Civil Rights Act.

160. Skanska did not provide Ms. Murphy with any employee benefits (besides wages).

161. Ms. Murphy has been a member of Union for sixteen (16) or seventeen (17) years (since 2004).

162. Ms. Murphy continues to be a member of Union as of the filing of this Complaint.

163. Ms. Murphy was a member of Union during the time period of May 22, 2019 to May 31, 2019.

164. A male individual named Donald Lee Mack ("Mr. Mack") continues to be a member of Union.

165. Mr. Mack was a member of Union during the time period of May 22, 2019 to May 31, 2019.

166. Mr. Mack is a trained Diesel Mechanic or is otherwise well-versed in the operation and repair of construction equipment.

167. Union supplied employees including Ms. Murphy for a project with Skanska.

168. The project for which Union supplied employees to Skanska began on or about May 22, 2019 and was performed in Maysville, Kentucky.

169. Ms. Murphy was the only female Operator at the Maysville, Kentucky location during her tenure.

170. Ms. Murphy was the only female Crane Operator at the Maysville, Kentucky location during her tenure.

171. Ms. Murphy was the only female Skanska employee at the Maysville, Kentucky location during her tenure.

172. Ms. Murphy was the only female employee with her particular set of duties at the Maysville, Kentucky location during her tenure.

173. Ms. Murphy was terminated from Skanska on May 31, 2019.

174. Mr. Mack, who had worked alongside Ms. Murphy during her Skanska tenure, retained his employment with Skanska until the end of the project, which ended in November of December of 2019.

175. Ms. Murphy was replaced with one or more able-bodied male employees.

176. Ms. Murphy was replaced with three (3) able-bodied male employees.

177. Ms. Murphy was replaced with one or more able-bodied male employees at least one of whom were under forty (40) years old.

178. The male replacements were also members of Union at the time that they replaced Ms. Murphy.

179. The male replacements did not suffer from any vision impairment.

180. The male replacements did not suffer from any hearing impairment.

181. The male replacements did not suffer from a vision impairment to the extent that Ms. Murphy suffers from a vision impairment.

182. The male replacements did not suffer from a hearing impairment to the extent that Ms. Murphy suffers from a hearing impairment.

183. Union caused, attempted to cause, or conspired with Skanska to discriminate against Ms. Murphy on the basis of sex and/or disability.

184. Union itself discriminated against Ms. Murphy on the basis of sex and/or disability.

185. Union adversely affected Ms. Murphy's status as a Skanska employee.

Union did not advocate for Ms. Murphy when Skanska terminated.

186. Union did not object to or in any way challenge Skanska's termination of Ms. Murphy.

187. Following her termination from Skanska, Ms. Murphy informed Union Business Representative Richard Lewis ("Lewis") that she intended to pursue a grievance within the union.

188. Lewis forbade Ms. Murphy from filing a grievance herself, asserting that he would have to file a grievance on her behalf.

189. Via phone call on June 24, 2019 and via email on June 25, 2019, Lewis also refused to file a grievance on Ms. Murphy's behalf, leaving her without recourse.

190. It was therefore clear to Ms. Murphy that pursuing Union's grievance procedure would be futile or at least biased against her.

191. Union forbids its members to search for their own work and fines them $10,000 (along with expelling them from their union membership) if they do search for their own work.

192. Subsequent to her termination from Skanska, Ms. Murphy's finances were such that she was forced to locate several short-lived projects on her own.

193. Subsequent to her termination from Skanska, Union passed over Ms. Murphy for many lucrative job referrals, instead awarding them to young, able-bodied men such as Joshua Mullins ("Mullins").

194. In 2020, Mullins was under thirty (30) years old.

195. In 2020, Mullins was under thirty-five (35) years old.

196. In 2020, Mullins was under forty (40) years old.

197. Specifically, Lewis awarded the job to Mullins over Ms. Murphy.

198. Mullins has only been in the Union for six (6) or seven (7) years.

199. Union unlawfully discriminated against Ms. Murphy on the bases of age, disability, and sex.

200. Union has discriminated against Ms. Murphy on the bases of age, disability, and sex prior to 2019 as well. For instance, in approximately the year 2012, Union awarded Ms. Murphy's job to a twenty-five (25) year old able-bodied man named Tony Rodgers ("Rodgers") (who was a convicted felon). Rodgers subsequently informed Ms. Murphy that he was told he was "replacing an old woman."

201. Union has never filed a grievance on Ms. Murphy's behalf.

202. Female members of Union have sought or made grievances on the basis of sex before.

203. Union has never pursued grievances on behalf of female members on the basis of sex before.

204. Members of Union have sought or made grievances on the basis of disability before.

205. Union has never pursued grievances on behalf of members on the basis of disability before.

206. Members of Union have sought or made grievances on the basis of age before.

207. Union has never pursued grievances on behalf of members on the basis of age before.

208. Union's actions towards Ms. Murphy were in bad faith or discriminatory or at least arbitrary or perfunctory.

209. Due to Union's violation of the KCRA, Ms. Murphy is entitled to compensatory damages, attorney's fees, lost wages, and costs.

**WHEREFORE,** Plaintiff respectfully requests that this Court award:

A. Judgment against Defendant, including compensatory damages, liquidated damages, prejudgment interest, front pay, and backpay, in excess of the minimum jurisdictional amount of this Court, in an amount to be proven at trial;

B. Trial by jury;

C. Plaintiff's costs herein expended including an award of reasonable attorney's fees; and

D. Such other relief to which she may be entitled.

Respectfully Submitted,

MEYMAN LAW PLLC

\s\ H. Gera Meyman, Esq.
P.O. Box 54693
Lexington, KY 40555
Telephone: 859-600-6529
Email:gera@meymanlaw.com
**ATTORNEY FOR PLAINTIFF**